IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELLEN ZACCHEO CAPELL          :     CIVIL ACTION
                              :
        v.                    :
                              :
PULTE MORTGAGE L.L.C., et al. :     NO. 07-1901

MEMORANDUM

Dalzell, J.                                November 7, 2007

        In 2006, plaintiff Ellen Zaccheo Capell bought a house

from a Pulte Homes of PA, L.P. ("PHPA").  The purchase agreement

stated that if Capell used certain real estate settlement service

providers affiliated with PHPA, then Capell would (and did)

receive a $25,000 closing cost credit.

        Capell sued Pulte Homes, Inc., Pulte Mortgage L.L.C.,

Pulte Closing Services, L.L.C., Pulte Diversified Companies,

Inc., and Pulte Home Corporation (together "Pulte"), alleging

that by offering a $25,000 closing cost credit, Pulte required

her to use affiliated settlement services providers, thereby

violating the Real Estate Settlement Procedures Act ("RESPA").

12 U.S.C. § 2601, et seq.  Pulte moved to dismiss Capell's

complaint based on Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## I.  **Background**

        On June 12, 2006, Capell and PHPA entered into a

purchase agreement for a new house to be built in a development

at Chester Springs, Pennsylvania.  Compl ¶ 22, Ex. 1.  According

to the construction order, the house cost about $450,000.  Id.

Ex. 1  The purchase agreement included various addenda, including

Affiliated Business Arrangement Disclosure Statements, and a

Concession Addendum.  Id. ¶ 23, Ex. 2, 3, 4.

The Affiliate Business Arrangement Disclosure

Statements stated that PHPA was the "Majority Member" of both

Pulte Mortgage and Pulte Closing Services.  Id. Ex. 2, 3.  These

Statements listed the anticipated costs for using the respective

services.  Id.  The Statements included the following language in

bolded type just above the acknowledgment and signature line:

> You are NOT required to use [the Pulte affiliated
> service] as a condition for the purchase of the
> Property.  THERE ARE FREQUENTLY OTHER SETTLEMENT
> SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU
> ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE
> RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE
> SERVICES.

Id.

The Concession Addendum presented the "Smart Buyer

Bonus Program", which offered buyers of Pulte houses either a

price reduction or a closing cost credit for using businesses

affiliated with PHPA.  Id. Ex. 4.  The Addendum stated that

Capell would receive a $25,000 closing credit if she (1) obtained

her mortgage from Pulte Mortgage, (2) used Pulte Closing Services

or another settlement service PHPA selected, and (3) settle on the house within 120 to 160 days from the start of construction. Id.  The Addendum stated that the seller would not be obligated to reduce the price or provide the closing credit if the buyer opted not to use the affiliated services.  Id.  It also stated that "the choice of a title agency and lender is the Purchaser's sole decision and Purchaser is not obligated to use Pulte Closing Services, Pulte Mortgage, LLC or to elect the Smart Buyer Bonus Option."  Id.

On June 12, 2006, Capell signed the purchase agreements and various addenda.  Id. Ex. 1, 2, 3, 4.  She secured her mortgage through Pulte Mortgage and got title insurance through Pulte Closing Services.  Id. ¶ 25.

On May 10, 2007, Capell filed suit in this Court, arguing that by giving her the $25,000 closing cost credit Pulte obligated her to use Pulte Mortgage and Pulte Closing Services, and this violated RESPA § 8(a), § 8(b), and § 9, codified at 12 U.S.C. §§ 2607(a)-(b), 2608.  Pulte moved to dismiss the complaint, contending that the facts Capell averred do not state a claim under RESPA, and that Capell lacks standing to bring these claims.

3

II.  **Analysis**[1]

Congress enacted RESPA in 1974 to advance disclosure of settlement costs, eliminate kickbacks and fees that increase such costs, reduce the funds buyers place in escrow prior to the closing of real estate sales, and modernize recordkeeping of title information.  12 U.S.C. § 2601(b).  To further these aims, RESPA creates certain prohibitions and obligations relating to any transaction involving a "federally related mortgage loan." Id. § 2602(1).  Capell alleges that Pulte violated RESPA §§ 8(a), 8(b), and 9.

RESPA § 8(a) creates a blanket prohibition against giving or receiving "any fee, kickback, or thing of value

---

[1]In reviewing a motion to dismiss for failure to state a claim, "[w]e accept all well pleaded factual allegations as true and draw all reasonable inferences from such allegations in favor of the complainant."  Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 653 (3d Cir. 2003). To survive a motion to dismiss, the plaintiff must "allege facts sufficient to raise a right to relief above the speculative level."  Broadcom Corp. v. Qualcomm Inc., __ F.3d __, 2007 WL 2475874, at *14 (3d Cir. Sept. 4, 2007) (citing Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).  The complaint must include "enough facts to state a claim to relief that is plausible on its face."  Twombly, 127 S. Ct. at 1974. This requires "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."  Haspel v. State Farm Mut. Auto. Ins. Co., 2007 WL 2030272 at *1 (3d Cir. Jul. 16, 2007) (unpublished) (quoting Twombly, 127 S. Ct. at 1969).

pursuant to any agreement or understanding...that business incident to...real estate settlement service...shall be referred to any person." Id. § 2607(a).  RESPA § 8(b) imposes a similar prohibition against giving or receiving a portion "of any charge...for the rendering of a real estate settlement service...other than for services actually performed." Id. § 2607(b).

RESPA § 8(c), however, exempts certain types of referrals from RESPA § 8(a) and 8(b)'s prohibitions.  Id. § 2607(c).  Relevant here, RESPA § 8(c) permits referral through "affiliated business arrangements" (hereinafter "ABAs") under certain circumstances.  Id.  An ABA is an agreement between someone "in a position to refer business incident to...a real estate" transaction and a real estate settlement service provider where the referring party has "an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent" in the settlement service provider.  Id. § 2602(7).  RESPA exempts referrals through ABAs if (1) the referred settlement service provider discloses the ABA and gives a written estimate of charges to the person referred to them, (2) "such person is not required to use any particular provider," and (3) "the only thing of value" that the referring party receives (other than

payments specifically permitted by 12 U.S.C. § 2607(c)) is a
return on investment in the affiliated business.  Id. §
2607(c)(4).

RESPA § 9 prohibits sellers of houses from
"requir[ing], directly or indirectly, as a condition to selling
the property, that title insurance...be purchased...from any
particular title company."  Id. § 2608.

Pulte cites three reasons why we should dismiss this
case.  First, it argues that RESPA does not prohibit closing cost
credits because such credits do not require the buyer to use the
affiliated services.  Def.'s Mem. at 2, 8-13.  Since the
"required...use" of a settlement service provider is an element
of each cause of action Capell asserts, her claim must fail under
Rule 12(b)(6).  Id.  Second, Pulte argues that even if Capell has
sufficiently alleged required use, she fails to allege the other
elements of her claims.  Id. at 2-3, 14-17.  Under RESPA § 8(a),
Pulte notes that Capell fails to assert a kickback or referral
agreement; under RESPA § 8(b), she fails to assert that her
settlement service fees were split by the providers; and under
RESPA § 9, she fails to sue the seller of the property as the
statute requires.  Id.  Third, Pulte contends that Capell did not
suffer an injury in fact, and therefore lacks standing to sue

6

because she did not allege Pulte overcharged her for any settlement costs.  Id. 3, 17-22.

We shall move from Pulte's last argument to its first. First, Capell does have standing to assert claims against Pulte, but, second, she has failed allege all the necessary elements to state a claim under RESPA §§ 8(b) and 9.  Third, Capell has failed to allege facts sufficient to establish that Pulte's closing cost credit required her to use Pulte's affiliated settlement service providers.  Thus, we shall dismiss Capell's entire complaint.

## A.   **Standing**

Both parties believe that Article III standing is an issue in this case.  For a plaintiff to have constitutional standing, she must establish (1) an injury in fact, i.e., invasion of plaintiff's legally protected interest that is (a) concrete and particularized, and (b) actual and imminent (rather than conjectural or hypothetical); (2) a causal connection between plaintiff's injury and defendant's conduct, i.e., no intervening, independent action of a third party caused plaintiff's injury; and (3) it is likely, and not merely speculative, that a favorable decision will redress plaintiff's

injury.  Trump Hotel & Casino Resorts, Inc. v. Mirage Resorts
Inc., 140 F.3d 478, 484-85 (3d Cir. 1998) (citing Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  But "[standing
may exist] solely by virtue of statutes creating legal rights,
the invasion of which creates standing."  Warth v. Seldin, 422
U.S. 490, 500 (1975) (internal quotations omitted).

        Pulte argues that a plaintiff asserting a RESPA
violation must allege a settlement fee overcharge; if not, the
plaintiff has suffered no injury in fact.  Def. Mem. at 17-22.
Capell argues that alleging financial injury "is not a
prerequisite to Article III standing" to bring a RESPA claim
because Pulte's failure to comply with RESPA is itself the injury
Congress envisioned when it created a private right of action in
RESPA.  Pl.'s Mem. at 21-22.  Each side cites cases in support of
their position, all of which turn on the interpretation of RESPA
§ 8(d)(2), which states,

> Any person or persons who violate the
> prohibitions or limitations of this section
> shall be jointly and severally liable to the
> person or persons charged for the settlement
> service involved in the violation in an
> amount equal to three times the amount of any
> charge paid for such settlement service.

12 U.S.C. § 2607(d)(2).  The cases Capell cites hold that this
language does not oblige the plaintiff to pay an overcharge in

order to have standing to bring suit.  Robinson v. Fountainhead
Title Group Corp., 447 F. Supp. 2d 478, 486-89 (D. Md. 2006);
Kahrer v. Ameriquest Mortgage Co., 418 F. Supp. 2d 748, 753-754
(W.D. Pa. 2006); see also Yates v. All American Abstract Co., 487
F. Supp. 2d 579, 582 (E.D. Pa. 2007).  Pulte cites cases that
hold the opposite.  Cater v. Welles Bowen Realty, 493 F. Supp. 2d
921, 927 (N.D. Ohio 2007); Contawe v. Crescent Heights of
America, Inc., 2004 WL 2244538, *3-4 (E.D. Pa. Oct. 1, 2004);
Mullinax v. Radian Guaranty, Inc., 311 F. Supp. 2d 474, 486
(M.D.N.C. 2004); Moore v. Radian Group, Inc., 233 F. Supp. 2d
819, 825 (E.D. Tex. 2002).

   With all due respect to courts who have decided the
RESPA § 8(d)(2) issue on standing grounds, we believe that this
question is more properly analyzed under Rule 12(b)(6).[2]  The

---

   [2]This particular RESPA issue is an instance in which the
standing analysis collapses into a 12(b)(6) analysis.  Pulte's
cases all focus on the statute requiring an overcharge as the
injury in fact.  E.g., Moore v. Radian Group, Inc., 233 F. Supp.
2d 819, 825 (E.D. Tex. 2002).  If a plaintiff must be overcharged
to suffer an injury in fact, then no one could ever state a claim
under RESPA without alleging an overcharge.  On the other hand,
Capell's cases hold that the plaintiff suffers a non-financial
injury when defendant violates RESPA.  E.g., Robinson v.
Fountainhead Title Group Corp., 447 F. Supp. 2d 478, 489 (D. Md.
2006) ("lack of impartiality in the referral and a reduction of
competition between settlement service providers").  If a
plaintiff can show injury in fact by pointing to non-financial
injury, then no one would have to allege an overcharge to

standing doctrine's goal is to determine whether the plaintiff's
complaint alleges more than "that he suffers in some indefinite
way in common with people generally." Lujan, 504 U.S. at 574
(quoting Massachusetts v. Mellon, 262 U.S. 447, 488-89 (1923)).
An inquiry into standing is an inquiry as to "who" the proper
person to bring suit is, and courts analyze "injury in fact" to
further this inquiry.  Capell has alleged that Pulte violated
RESPA, affecting her in a way that is distinct from people
generally.  We agree that if anyone can bring this suit under
this statute, it is Capell.

      The proper inquiry here is not "who" can sue, but what
elements make up the cause of action under RESPA.  Capell and
Pulte are not really arguing about whether Capell is the
appropriate litigant.  Rather, they are at odds over whether
RESPA liability attaches only if the plaintiff alleges an
overcharge.  Viewed through the lens of Fed. R. Civ. P. 12(b)(6),
the question is whether an overcharge is an element of a cause of
action under RESPA.  Thus, we shall employ the 12(b)(6) standard,
and answer the question in the negative.

---

establish a claim.  We believe adding a constitutional dimension
to the inquiry only muddles the analysis, so we avoid discussing
the issue at hand in such terms.

Under RESPA § 8(d)(2), defendants are liable for an "amount equal to three times the amount of any charge paid for such settlement service."  12 U.S.C. § 2607(d)(2).  One line of cases, primarily relying on the analysis in Moore, holds that to maintain a RESPA claim a plaintiff must allege an overcharge for settlement services.  Moore, 233 F. Supp. 2d at 825; see Cater, 493 F. Supp. 2d at 927; Contawe, 2004 WL 2244538, *3-4; Mullinax, 311 F. Supp. 2d at 486.  Moore focused on the Congressional purpose for RESPA, which is "to insure that consumers...are protected from unnecessarily high settlement charges."  12 U.S.C. 2601(a); see Moore 233 F. Supp. 2d at 825.  Moore interpreted RESPA's § 8(d)(2) "any charge paid" language to mean the amount charged above the proper rate.  Moore 233 F. Supp. 2d at 826.  It concluded that if the defendant did not subject the consumer to higher settlement charges, then the Congressional purpose was not implicated and the plaintiff cannot sustain a claim.  Id. at 825.

Another line of cases, primarily relying on the analysis of Kahrer, holds that RESPA § 8(d)(2)'s "any charge paid" language includes all of the relevant settlement charges, and thus no overcharge is necessary to sustain a claim.  Kahrer, 418 F. Supp. 2d at 753-754; Yates, 487 F. Supp. 2d at 582; Robinson, 447 F. Supp. 2d at 486-89.  Kahrer pointed to the plain

11

language of the statute -- which creates liability for "any charge paid" -- suggesting that damages should be calculated from the totality of the settlement charges rather than a portion of them.  Kahrer, 418 F. Supp. 2d at 753.  Also, Kahrer took issue with Moore's reading of the legislative history -- specifically, that it failed to consider the 1983 amendment to RESPA that created the language as it exists today -- in the relevant portion of the statute.  Kahrer, 418 F. Supp. 2d at 753-54. Kahrer pointed to a House Committee Report that stated that Congress feared that ABAs, if abused, could cause "the advice of the person making the referral [to] lose its impartiality ...[and ABAs could] effectively reduce the kind of healthy competition generated by independent settlement service providers."  Id. at 754 (quoting H.R. Rep. No. 97-532, 97th Cong., 2nd Sess. at p. 52 (1982)).  Kahrer took this as an indication that Congress intended to expand RESPA liability to include "harm to consumers beyond an increase in settlement charges as had been the concern when RESPA was first enacted."  Id.

We find the Kahrer line of cases more persuasive. First, limiting RESPA § 8(d)(2)'s "any charge paid" language to overcharges is less consistent with the plain language of the statute than reading the locution as including the entirety of

12

the settlement charge.[3]  Second, the 1983 amendment changed RESPA's statutory language in important ways that the <u>Moore</u> line fails to acknowledge.  Third, the <u>Moore</u> line relies on a narrow reading of Congress's purpose of protecting consumers from unnecessarily high settlement charges.  RESPA allows individuals to police the marketplace in order to ensure impartiality of referrals and competition between settlement service providers, thereby creating a market-wide deterrent against unnecessarily high settlement costs.  Suits without overcharges thus advance Congress's goals under this statute.

Therefore, Capell does not have to allege an overcharge to state a claim under RESPA.

### B.   Failure of <u>Prima Facie</u> Case for RESPA §§ 8(a),(b) and 9

Pulte asserts that Capell fails to properly allege specific elements of her claims under RESPA §§ 8(a), 8(b), and 9. Specifically, Pulte first argues that Capell's RESPA § 8(a) claim

---

[3] Pulte's view also seems to misunderstand the exact harm that Congress is trying to protect against.  Through RESPA § 8(a), Congress prohibited creating arrangements to refer business except, of course, for the exemptions.  Much like conspiracy, it is the agreement itself that is the wrong, and the defendant need do no more than engage in such a nonexempt agreement to have wronged the plaintiff.

fails because she has not alleged any "agreement or understanding" to give "fee[s], kickback[s], or thing[s] of value" to various Pulte entities.  12 U.S.C. 2607(a); see Def.'s Mem. at 14-15.  Capell alleges the existence of legal relationships between the various Pulte entities, and asserts that PHPA did refer her to Pulte Mortgage and Pulte Closing Services.  Compl. ¶¶ 3-8, 24.  More importantly, Capell alleges that the Pulte entities were involved in an ABA under RESPA.  Id. ¶ 26.  RESPA acknowledges that one "thing of value" is a "return on the ownership interest".  12 U.S.C. § 2607(c)(4)(C).  Thus, Capell has alleged facts from which one can infer the existence of an "agreement or understanding" between these entities that PHPA would refer business to Pulte Mortgage and Pulte Closing Services, and receive a "thing of value" in the form of return on investment.

Second, Pulte contends that Capell's claim under RESPA § 8(b) must fail because she does not allege any fee splitting on the part of any of the Pulte entities.  Def.'s Mem. at 15-16. This RESPA provision prohibits a settlement service provider from both unilaterally marking-up a third-party fee and splitting fees with other settlement service providers who have done no actual work.  See Santiago v. GMAC Mortgage Group, Inc., 417 F.3d 384,

390 (3d Cir. 2005).  Capell does not allege any instance of fee splitting or unilateral mark-ups.  Instead, she argues that Pulte's failure to satisfy the ABA exemption contained in 12 U.S.C. § 2607(c) is sufficient to establish a <u>per se</u> violation of all of RESPA.  Pl.'s Mem. at 25-26.  Capell is wrong.  She must still establish all the elements of the <u>prima facie</u> case outlined in that part of the statute that gives her a private right of action.  Simply stating something is a <u>per se</u> violation does not make it so.

Third, Pulte argues that RESPA § 9 only creates liability for the seller of the property, and Capell has not sued the seller, PHPA.  Def. Mem. at 16-17.  Capell argues that there is "factual ambiguity" as to the seller of the house.  Pl. Mem. at 26.  But the first line of the purchase agreement clearly identifies PHPA as the seller of the house.  Compl. Ex. 1. Capell also claims that Pulte's use of various corporations to do business in several states permits Capell to forego suing the right entity.  Pl. Mem. at 26.  Although all of the Pulte entities are in a sense legal fictions, the law recognizes them as separate, distinct juridical persons.  <u>See, e.g., Klein v. Board of Tax Sup'rs of Jefferson County</u>, 282 U.S. 19, 24 (1930). The statutory provision in question creates liability <u>only</u> for

15

the seller of the property.  12 U.S.C. § 2608.

Thus, Capell has failed to state a claim under RESPA §§ 8(b) and 9, and we will dismiss counts II and III of her complaint on these grounds.

### C.   Required Use of Specific Settlement Service Providers

Assuming that Capell could make out all of the other elements of her various claims, the validity of Capell's complaint ultimately turns on whether she can establish that PHPA's closing cost credit _required_ her to use Pulte Mortage and Pulte Closing Services as her settlement service providers.  This type of "required use" is a central element in each of her RESPA claims.  Although a "closing cost credit" may still constitute a "required use" of particular settlement providers, Capell has here not alleged facts sufficient to infer that from her complaint.

To move forward with _any_ of her claims, Capell must establish that the closing cost credit _obligated_ her to use Pulte Mortgage and Pulte Closing Services.  All claims under RESPA § 8 are subject to § 8(c)'s exemptions.  12 U.S.C. § 2607(c).  Thus, a plaintiff asserting a RESPA § 8 claim must establish that the transaction is not exempt under RESP § 8(c).  To qualify as an

exempt ABA, <u>inter alia</u>, the referred person must not be required to use any particular settlement service provider.  12 U.S.C. § 2607(c)(4).  Similarly, a plaintiff suing under RESPA § 9 must establish that the seller "require[d]...as a condition to selling the property [that the buyer use a] particular title company."  12 U.S.C. § 2608(a).

The United States Housing and Urban Development("HUD") has defined "required use" in its implementing regulation as an instance in which

> a person <u>must use</u> a particular provider of a
> settlement service in order to have access to
> some distinct service or property, and the
> person will pay for the settlement service of
> the particular provider or will pay a charge
> attributable, in whole or in part, to the
> settlement service.

24 C.F.R. § 3500.2 (2007) (emphasis added).  HUD palpably sought to permit certain types of incentives to use affiliated settlement services.  It specifically excluded from its definition of "required use" offering "discounts or rebates to consumers for the purchase of multiple settlement services" as long as those discounts and rebates were "optional to the purchaser" and were a "true discount below the prices that are otherwise generally available, [and not] made up by higher costs elsewhere in the settlement process."  <u>Id.</u>

17

On its Web site, HUD offers a basic example of how this definition is applied:

> **Question**: A builder is offering to pay my closing costs or give me an upgrade package only if I agree to use his mortgage company. Is this legal under RESPA?
>
> **Answer**: Yes. While a builder cannot require you to use a mortgage company with whom he is affiliated, a builder is allowed to offer you a discount if you use a specific company. Under RESPA, the builder cannot charge you more for the home if you do not use his affiliated mortgage company.

U.S. Department of Housing and Urban Development, Frequently Asked Questions About RESPA, <u>found</u> <u>at</u> http://www.hud.gov/offices/hsg/sfh/res/resconsu.cfm (last visited November 1, 2007).

Also, two courts have taken up a similar issue to the one presented here, and have held that such large, optional credits or rebates do <u>not</u> amount to "required use."  <u>See</u> <u>Spicer v. The Ryland Mortgage Group, Inc.,</u>__ F. Supp. 2d __, 2007 WL 3071419, (N.D. Ga., October 18, 2007) (holding that offering a $10,500 discount on approved settlement costs incurred through use of specified providers without more was not "required use"); <u>Geisser v. NVR, Inc.</u>, 2001 WL 36016177 (M.D. Tenn. May 15, 2001) (holding that seller's optional contributions to closing costs for use of specified settlement service providers was not

"required use").

Capell urges that the HUD interpretation of "required use" does not permit Pulte to discount the cost of the house itself because the only type of inducement the HUD regulations permits is a discount on the cost of the settlement services itself -- all other discounts or rebates are prohibited.  Def. Mem. at 17-19.  The HUD regulations place no restrictions on what type of discount or rebate one can offer, other than that it must be "true" and "optional."  24 C.F.R. 3500.2.  Nothing in the language of the regulations or the examples suggests otherwise.[4] Indeed, if adopted, Capell's view of the regulation would lead to absurd results.  For example, it would be impermissible to offer a free month's dry cleaning, a car wash, or a box of cookies as optional inducements to use specified settlement service providers because none of these is a direct discount applied to the price of settlement services.  We do not think the HUD regulations sweep so far.

_____

[4] The one example Capell does provide from HUD's implementing regulation concerns instances when it is appropriate to compensate individuals for referring business, and is inapposite here.  Id. at 18.  Capell points to no other portion of the regulations or any examples of its application to support her contention.

19

None of this implies that one can avoid RESPA liability by simply labelling an inducement to use specified settlement services a "credit" or a "discount."  A credit or discount could be structured to require use of specified service providers.  For example, a plaintiff could establish required use if she alleged a seller conducted a bait and switch where the negotiated price assumed the inclusion of such a credit, and the seller did not tell the buyer this until the deal was ready to close.  Or a RESPA claim may lie if a seller threatened a buyer with an increased price unless the buyer used specified settlement services, and then the seller wrote up the contract to reflect that the price arrived at was actually at a discount from the threatened increased price.  But see Geisser, 2001 WL 36016177, at *4 (holding a plaintiff cannot assert a claim on such facts because such allegations do not amount to "illiteracy, fraud or duress" sufficient to overcome the parole evidence rule).

But Capell does not aver these or any other facts from which we could infer that she was required to do anything -- indeed, she proffers nothing to undermine the plain meaning of the Addendum's "choice" language.  Instead, Capell argues that the closing cost credit required her to use Pulte's settlement service providers because Capell's only "viable economic option

was to use the affiliate service providers, because the price of her home (even after paying the affiliate service providers for their services) would be far less if she did so."  Pl.'s Mem. at 2.  The crux of Capell's argument is that the credit was so big she could not turn it down, so she had to use Pulte's specified service providers, which she otherwise would not have done.  This alone cannot be enough to establish that the closing cost credit constituted "required use" of the settlement service providers. Capell has not alleged that the sale of the home was ever conditioned upon her using the settlement service providers, nor has she averred that she expected to get that credit for any other reason.  For an act to be "required" there must be some element of coercion -- as implied in a Corleone-type "offer he can't refuse" -- and it must be alleged in the complaint.

Capell attempts to resurrect her claims by analogizing Pulte's closing cost credit to a "tie-in" arrangement in the antitrust context.  Antitrust law prohibits combining products together in such a way that purchasing such products separately is prohibitively expensive, while the products bundled together are not.  In antitrust, certain types of discounts or package sales can contain "the element of coercion" if "the combined purchase is the only economically- viable alternative."  Ramallo

21

Bros. Printing, Inc. v. El Dia, Inc., 392 F. Supp. 2d 118, 134-35

(D.P.R. 2005) (citing Marts v. Xerox, Inc., 77 F.3d 1109, 1113

(8th Cir. 1996); Ortho Diagnostic Sys., Inc. v. Abbott Labs.,

Inc., 920 F. Supp. 455, 471 (S.D.N.Y. 1996)).  We are

uncomfortable importing jurisprudence from the antitrust area,

which involves repeated transactions between varying

participants, into the RESPA context, which involves a single

transaction with fixed participants.  The legal realms are too

distant from one another.  Moreover, plaintiff offers no reasons

for us to use this jurisprudence to inform the terms of RESPA, so

we decline to do so.  But at bottom, the bold language just above

the Disclosure Statements' signature line could not reasonably be

construed to imply an anticompetitive tie.

Thus, Capell has failed to aver facts sufficient to

characterize the closing cost credit Pulte offered as a "required

use" under RESPA § 8(c).  Since this is a central element to all

of the RESPA claims Capell asserts, we must dismiss all of her

claims under Fed. R. Civ. P. 12(b)(6).

BY THE COURT:


/s/ Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELLEN ZACCHEO CAPELL          :      CIVIL ACTION
                              :
          v.                  :
                              :
PULTE MORTGAGE L.L.C., et al. :      NO. 07-1901

ORDER

_____ AND NOW, this 7th day of November, 2007, upon

consideration of the defendants' motion to dismiss (docket entry

#3), plaintiff's response, and defendants' reply, it is hereby

ORDERED that:

        1.   Defendants' motion is GRANTED;

        2.   Plaintiff's complaint is DISMISSED WITHOUT

PREJUDICE; and

        3.   Plaintiff is GRANTED LEAVE to file an amended

complaint if she does so conformably with Fed. R. Civ. P. 11 by

November 21, 2007.

                        BY THE COURT:



                        /s/ Stewart Dalzell, J.